## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| REUBEN WADE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 17-4875 |
| | : | |
| RYAN MCCARTHY, Acting Secretary of the Department of the Army, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                        **OCTOBER 29, 2018**

Plaintiff Reuben Wade ("Wade") is a civil engineer in the Philadelphia District of the

United States Army Corps of Engineers (the "Army" or "Government"). He applied for a

promotion to the position of Operations and Maintenance Section Chief ("O&M Section Chief"),

interviewed for the job, and ultimately was not selected. A substantially younger individual was

chosen for the position. He then brought this action against the Government, alleging he was

discriminated against on the basis of his age in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. §§ 621-34.

The Army now moves for summary judgment on Wade's age discrimination claim,

contending that Wade was not hired for the position because a more qualified individual was

selected instead. Wade has filed a Memorandum of Law in Opposition, the Army has filed a

Reply Brief, and Wade has filed a Sur-reply. For the reasons that follow, the Army's Motion for

Summary Judgment is granted.

## I.    BACKGROUND

The Army has employed Wade from August 1998 through the present, comprising over twenty years of employment.  (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 2, Ex. A ("Wade Dep. Tr.") at 7.)  Wade currently works in the Geotechnical Division as a Civil Engineer.  (*Id.* at 6.)

Prior to his employment with the Army, Wade owned a construction and custom fabrication business from April 1975 to August 1991.  (*Id.* at 7.)  In that capacity, he worked closely with construction contractors and regularly managed construction contracts, including operation and maintenance contracts.  (*Id.* at 11.)  He was also responsible for interviewing and hiring employees, providing direction with job duties and tasks, and ensuring jobs were completed in a satisfactory manner.  (*Id.* at 9-10.)

Wade enrolled in the University of Kansas School of Engineering sometime in 1991.  (*Id.* at 12-13.)  He earned an engineering degree in 1997 and then began an internship with the Army in September 1998.  (*Id.* at 13, 15.)  During his time in the Army's internship program, Wade rotated through various divisions, including the Engineering and Construction Division, the Operations Division, and the Geotechnical Division.  (*Id.* at 15, 18, 207-08.)

Wade's internship with the Army lasted approximately two years.  (*Id.* at 18.)  He then assumed a position in the Army's Hydrology and Hydraulics Division for about one year.  (*Id.*)  Wade would further go on to work in various positions in the Army, such as Project Engineer, Project Manager, Design Manager, and Civil Engineer.  (*Id.* at 28, 44, 48-49, 211.)  During that time, he worked in the Engineering Management Section of the Engineering and Construction Division, and the Geotechnical Division.  (*Id.* at 21, 49, 211.)

In February 2016, Wade viewed a job announcement for O&M Section Chief. The job posting identified the duties of the O&M Section Chief and provided as follows:

> You will serve as the O&M Section Chief. You will be responsible for supervision of a portion of the District's Civil Works construction. You will perform professional engineering work in management of assigned projects; program planning for construction; inspection and acceptance of materials, supplies, and equipment; manages the District's natural resource program; prepares operations management plans: manages the recreation program and provides technical support for the operation and maintenance of flood control structures, water supply systems and navigation channel maintenance plans. The Districts Civil Works maintenance program is performed by contract forces and involves work associated with all District waterways (includes Delaware, Schuylkill, and Christiana Rivers and tributaries: Chesapeake and Delaware Canal; New Jersey Intracoastal Waterway, etc.), with an annual expenditure of approximately 30 million dollars. *Projects include maintenance dredging of approximately 275 miles of project channels; maintenance of waterfront structures (jetties, bulkheads, dikes, etc.)*; shore projection, bank stabilization and protection; construction of disposal areas, and removal of wrecks and obstructions. Duties include: Construction Management, Quality Management, Office Engineering Management, Contract Administration, Labor Standards and Safety Management.

(Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 2, Ex. C at 2 ("O&M Section Chief Job Announcement")) (emphasis added). The job announcement also stated that applicants would be evaluated on their levels of competency—referred to as knowledge, skills, and abilities ("KSA")—in the areas of (1) construction management knowledge, (2) ability to execute contract administration, (3) skill in communication, and (4) ability to supervise. (*Id.* at 4.) Applicants were required to submit an application package consisting of a resume, supporting documents, and responses to a questionnaire, all of which would then be used to determine a "quality ranking." (*See id.* at 6.)

In addition to the job announcement, Timothy Kelly ("Kelly"), Chief of the Technical Support Branch, drafted a "Selection Plan" for the O&M Section Chief positon based off a

previous selection plan that was used, which was further used to evaluate and rank the

candidates.  (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. A at 137-43; Ex. B ("Kelly Dep. Tr.")

at 17.)  The KSAs on the Selection Plan provided as follows:

1. **Leadership**.  Ability to supervise and manage individual and team activities of a staff of Project Engineers and Quality Assurance Representatives efficiently.

2. **Project Management and Execution**.  Ability to provide leadership and guidance to professional and technical workforce engaged in activities such as: defining project requirements; developing acquisition strategy; developing schedules; performing contract oversight; negotiating changes; providing technical guidance and/or decisions; and accepting work for the Government.

3. **Knowledge of Construction/Dredging Industry**.  Knowledge of construction industry as it relates to the construction of confined disposal facilities, maintenance dredging, and repair of flood control structures, jetties, bridges, etc.  Experience interpreting navigation channel and disposal area maintenance plans. Understanding and application of environmental regulations and standards as they apply to dredging and construction activities. Ability to formulate costs estimates for work to be completed, and negotiate with contractors both the scope of work required and fair and reasonable pricing for agreed upon change proposals submitted throughout the course of contracts.

4. **Communications**.  Ability to communicate orally and in writing for the purpose of: coordinating short range and long term goals; developing detailed plans and specifications for projects to be performed; negotiating with internal and external customers, and contractors throughout the project; and resolving controversial issues that may arise.

(Def.'s Mem. Law Supp. Mot. Summ. J., Ex. A at 140-43) (emphasis in original).

Wade applied for the O&M Section Chief position in February 2016, at which time he

was sixty-three years old.  (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 7.)  Seven candidates,

including Wade, applied for the job.  (*Id.* at 8.)  A selection panel (the "Panel"), which consisted

of Kelly, John Tunnel ("Tunnel"), Deputy Chief of Engineering and Construction, Michael

Landis ("Landis"), Assistant Chief of Operations, and Anthony DePasquale ("DePasquale"), Chief of Operations Division, reviewed the application packages and held a conference call to rank the candidates to find a competitive range of applicants to interview.[1] (*Id.* at 7-8; Kelly Dep. Tr. at 32.) Prior to conducting interviews, the Panel ranked Gavin L. Kaiser ("Kaiser") first based on the application packages. (*See* Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J., Ex. L ("Justification for Selecting Kaiser").) At the time, Kaiser was thirty years old. (Wade Dep. Tr. at 117.)

The Panel invited all seven of the applicants to interview, with six agreeing. (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. E ("Tunnel Dep. Tr.") at 38.) The interviews took place on April 7, 2016, and each lasted approximately thirty minutes.[2] All candidates were asked the same ten questions, the first being to "[d]escribe your field experience and knowledge of operation and maintenance activities specifically related to dredging, dams and bridges." (*See id.*, Ex. A at 152-53.) Following the interviews, the Panel discussed the candidates and gave each a final ranking. (Tunnel Dep. Tr. at 42-43.) The Panel determined Kaiser was the most qualified and that Derek Burleigh was second. (Def.'s Mem. Law. Supp. Mot. Summ. J., Ex. A at 148.) Wade was ranked fourth overall at the conclusion of the interviews. (*Id.*)

The day after interviews took place, Kelly prepared a "Justification" for the Panel's decision to select Kaiser for O&M Section Chief. (*See* Justification for Selecting Kaiser.) Kelly wrote that Kaiser had five years of experience within the Technical Support Branch of the O&M Section in the Philadelphia District, and "[h]is superior knowledge of dredging, dam and bridge

---

[1] The Army represents that Kelly was born in 1972; Tunnel in 1948; Landis in 1967; and DePasquale in 1962. (Def.'s Mem. Law Supp. Mot. Summ. J. 2.)

[2] Michele Ryan (born in 1961) from Human Resources and William Bouyer (born in 1936) from the Equal Employment Office were also present for the interviews. (*Id.*)

construction contract administration[,] along with his experience within the Operation and Maintenance Section[,] [made] [him] the ideal selection." (*Id.*) Regarding Kaiser's interview performance, Kelly wrote that he "answered all of the questions with a calm confidence and convinced the panel that he was the best candidate for the job." (*Id.*) Kaiser further "demonstrated a knowledge of the construction contract processes and regulations that was superior to the other candidates[,]" and "his role as a . . . [Contracting Officer Representative ('COR')] and temporary supervisor[] gave him an edge over the other five candidates." (*Id.*)

On April 13, 2016, Wade received an email notifying him that he had not been selected for the position. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J., Ex. M (Email).) Soon afterwards, Kelly approached Wade and notified Wade in-person of his non-selection. (Wade Dep. Tr. at 124-25.) Wade told Kelly that he was not surprised at not being selected, as he believed Kaiser was pre-selected for the position. (*Id.* at 125.) Indeed, even before submitting his application, Wade heard from "watercooler conversation" that the Army planned to hire Kaiser as O&M Section Chief. (*Id.* at 117.) Wade testified at his deposition that Kelly did not deny the assertion that Kaiser was pre-selected. (*Id.* at 125.)

On May 11, 2016, Wade initiated a meeting with Tunnel because he "wanted to find out more about where [he] was in the selection." (*Id.* at 127.) Wade stated he was "distressed" because "after all [his] years of working hard for the district and being so well-known for [his] hard work and [his] actual successes that [he] wasn't selected when a very, very young man with limited experience, who [he] knew from the day he came into the district, was selected." (*Id.* at 126-27.) Tunnel informed Wade that he was in the middle of the applicant group. (*Id.* at 128.) When Wade asked Tunnel why that was, Tunnel said the Panel preferred someone with more dredging experience. (*Id.*) Wade responded by noting that dredging was barely mentioned in the

job announcement and that, from his point of view, dredging did not seem "to be the focus of the nature of that supervisory function." (*Id.*) During the meeting, Wade also testified that Tunnel mentioned that to explain why Wade did not get the position, Tunnel would "have to explain office politics to [him]." (*Id.* at 129.) Tunnel then said that he and Jose Alvarez, the then-Chief of the Engineering Branch, knew who they were going to select as O&M Section Chief. (*Id.*)

Wade filed suit in this Court following his fulfillment of all jurisdictional prerequisites. On July 30, 2018, the Army filed the instant Motion for Summary Judgment.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party

has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

### A. Age Discrimination Framework

Wade's sole claim in this action is that the Army failed to promote him based on his age. The ADEA provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). Claims of discrimination under the ADEA that are based on circumstantial evidence are subject to the three-step burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 (3d Cir. 1998).

First, the plaintiff must establish a prima facie case of discrimination. *Willis*, 808 F.3d at 644 (citing *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997)). To satisfy his

prima facie case in a failure to promote theory of discrimination, the plaintiff must demonstrate

the following: (1) he is at least forty years of age; (2) he applied for and was qualified for the job;

(3) he was rejected; and (4) "the employer either ultimately filled the position with someone

sufficiently younger to permit an inference of age discrimination or continued to seek applicants

from among those having plaintiff's qualifications." *Barber v. CSX Distribution Servs.*, 68 F.3d

694, 698 (3d Cir. 1995) (citing *Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d

59, 61 (3d Cir. 1989)). Once the plaintiff successfully satisfies his prima facie case, the burden

then shifts to the employer, "who must 'articulate a legitimate nondiscriminatory reason for the

adverse employment action.'" *Willis*, 808 F.3d at 644 (quoting *Jones v. Sch. Dist. of Phila.*, 198

F.3d 403, 412 (3d Cir. 1999)). If the employer satisfies this second step, the burden shifts back

to the plaintiff to "demonstrate that the employer's articulated reason was not the actual reason,

but rather a pretext for discrimination." *Simpson*, 142 F.3d at 644 n.5 (citing *St. Mary's Honor

Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

**B.    Application**

   **1.    *Prima Facie Case and Legitimate, Nondiscriminatory Reasons for the
         Adverse Employment Action***

In this case, and for purposes of the instant Motion for Summary Judgment only, the

Army concedes that Wade has established a prima facie case of age discrimination based on his

non-selection for the O&M Section Chief position.[3] (Def.'s Mem. Law Supp. Mot. Summ. J. 11

n.2.) The burden next shifts to the Army to articulate a legitimate, nondiscriminatory reason for

Wade's non-selection. *See Willis*, 808 F.3d at 644. The Army contends that it did not select

Wade because the selectee, Kaiser, had more relevant fieldwork and supervisory experience, a

---

[3] Indeed, the Army states that Wade has successfully established his prima facie case of age discrimination because "(1) he was over age 40 in 2016; (2) he applied, but was not selected for the position; (3) he was qualified for the position; and (4) the selectee, Kaiser, was under 40." (Def.'s Mem. Law Supp. Mot. Summ. J. 11 n.2.)

superior application package, and better performance during the interview.  (*See* Def.'s Mem.

Law Supp. Mot. Summ. J. 1.)  Specifically, the Army selected Kaiser over Wade because Kaiser

had more knowledge and experience of construction contract administration with respect to

dredging, dams, and bridges; more leadership experience and potential; and performed the best

out of all of the candidates during the interview.  (*Id.* at 2.)  Accordingly, the burden now shifts

back to Wade to show that the Army's articulated reasons were merely a pretext for age

discrimination.  *See Willis*, 808 F.3d at 644 (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d

Cir. 2013)); *Fasold v. Justice*, 409 F.3d 178, 185 (3d Cir. 2005).

### 2. *Pretext*

Once an employer offers legitimate, nondiscriminatory reasons for the adverse

employment action, the plaintiff must point to some evidence "from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that

an invidious discriminatory reason was more likely than not a motivating or determinative cause

of the employer's action."  *Simpson*, 142 F.3d at 644 (quoting *Fuentes v. Perskie*, 32 F.3d 759,

764 (3d Cir. 1994)).  Under the first prong of the *Fuentes* analysis, the plaintiff "must

demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions

in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could

rationally find them unworthy of credence."  *Keller*, 130 F.3d at 1108-09 (quoting *Fuentes*, 32

F.3d at 764)).  The second *Fuentes* prong requires the plaintiff to identify evidence in the

summary judgment record that allows the fact finder to infer "that discrimination was 'more

likely than not a . . . determinative cause of the adverse . . . action.'"  *Anderson v. Wachovia*

*Mortg. Corp.*, 621 F.3d 261, 271 (3d Cir. 2010) (ellipses in original) (quoting *Fuentes*, 32 F.3d at

764).

Wade appears to address both *Fuentes* prongs collectively and puts forth three arguments concerning how the Army's legitimate, nondiscriminatory reasons are a pretext for age discrimination. (*See* Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 19.) First, Wade claims he was "significantly more qualified" than Kaiser for the O&M Section Chief position. (*Id.*) Second, he argues that Kaiser was pre-selected for the position prior to any interviews being conducted. (*Id.*) Lastly, he states that the Army's evaluation of the candidates was entirely subjective. (*Id.*) After reviewing the record evidence, we conclude that Wade has failed to demonstrate that the Army's legitimate reasons for not selecting him were a pretext for age discrimination.

a.       Wade and Kaiser's Qualifications

Wade's first argument towards pretext is that he "was significantly more qualified" than Kaiser for the O&M Section Chief position. (*Id.* at 19.) In support of his allegedly superior qualifications, Wade provides a lengthy discussion of the various positions he has held in the Army, including those in the Engineering and Construction Division, the Operations Division, and the Geotechnical Division. (*See id.* at 19-22.) He also sets forth numerous instances of his experience in the management and administration of construction contracts, which he asserts makes him qualified to be O&M Section Chief. (*See id.*) Given that Kaiser possessed seven years of total experience (only five years outside of an internship), compared to Wade's forty years of experience in the construction industry and eighteen years of employment with the Army, Wade asserts that "it is impossible for an individual to adequately perform responsibilities of the O&M Section Chief position well with such limited experience." (*Id.* at 21.)

In making his argument that he was significantly more qualified than Kaiser, Wade fails to take into account the emphasis the Army placed on the O&M Section Chief having experience

in, *inter alia*, fieldwork and construction contract administration pertaining to dredging, bridges, and dams. The job announcement for the position specifically stated that the O&M Section Chief would be responsible for projects that include "maintenance dredging of approximately 275 miles of project channels" and "maintenance of waterfront structures (jetties, bulkheads, dikes, etc.)." (O&M Section Chief Job Announcement at 2.) Further, Kelly drafted the Selection Plan that was specific to the O&M Section Chief position. (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. A at 140-43.) The Selection Plan contained a heading that explicitly stated that one of the four KSAs was "Knowledge of Construction/Dredging Industry." (*Id.*) (emphasis omitted). The description under it provided that the Panel would evaluate candidates based on "[k]nowledge of [the] construction industry as it relates to the construction of confined disposal facilities, *maintenance dredging*, and repair of flood control structures, jetties, *bridges*, etc." (*Id.*) (emphasis added).

Several members of the Panel also testified as to the importance of the O&M Section Chief having experience with maintenance dredging contracts. Kelly testified in his deposition that the "primary job responsibilities of O&M section chief" would be to "oversee all operation and maintenance contracts, which include dredging, bridge contracts, dam contracts, shore protection, [and] possibly docks throughout the property owned by the Army Corps in [the] Philadelphia District." (Kelly Dep. Tr. at 24.) Landis, who was Kelly's supervisor and had previously held the O&M Section Chief position, testified that "[t]he mission of our organization is to manage—administer the O&M, operation and maintenance funded contracts that we . . . have in the district. Those contracts are primarily maybe like 75, 80 percent of our . . . maintenance dredging contracts." (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. D (Landis Dep. Tr.) at 31.) Landis also explained that the O&M Section Chief typically would be a COR and

may be involved in "complex negotiations that the project engineers may not be able to handle on their own." (*Id.* at 32.) Regarding why knowledge of construction and the dredging industry was listed as a KSA on the Selection Plan, Landis reiterated that the job significantly involves dredging. (*Id.* at 50.) Not surprisingly, Landis noted that the O&M Section Chief would ideally have training and a background in dredging and survey. (*Id.* at 34-35.)

During the interview, the first question posed to the applicants was for them to "[d]escribe [their] field experience and knowledge of operation and maintenance activities specifically related to dredging, dams and bridges." (Def.'s Mem. Law Supp. Mot. Summ. J., Ex. A at 152.) Kelly's interview notes reflect that Wade answered that he had no maintenance experience with dredging. (*Id.* at 163.) Likewise, DePasquale noted that Wade had "little field work" in dredging. (*Id.* at 161.) Landis noted that Wade had no direct experience with bridges and was not ever involved in maintenance dredging of channels. (*Id.* at 165.) Finally, Tunnel wrote that Wade had "no direct dredg[ing] experience." (*Id.* at 167.)

The Panel's interview notes from Kaiser's interview reflect, on the other hand, that he had five years of experience in Operations and Management, had worked on four dams and five bridges, and listed several examples of dredging projects that he worked on or managed. (*Id.*, Ex. A at 152, 155, 157, 159.) Additionally, his resume listed eleven contracts for which he was Project Engineer in the O&M Section, ten of which involved bridges, dams, dredging, or jetty repairs. (*Id.*, Ex. A at 128-35.) Kaiser's resume also showed forty-eight courses or programs he has participated in, including Bridge Inspection Course, Dredging Fundamentals Prospect #333, Operations Project Manager Prospect #245, USACE Fiscal Law Refresher, Construction Contract Administration Prospect #366, Contracting Overview, Contracting Officer Representative Course, COR Acquisition Ethics Training 2012, Advanced Leadership

Development Program, and Supervisor Development Course. (*Id.*, Ex. A at 133-34.)

Significantly, Kaiser was Acting Chief of the O&M Section, the position directly at issue in this

action, between April 2014 and September 2014. (*Id.*, Ex. A at 130-31.)

At his deposition, Wade stated that he had "not specifically" worked on any maintenance

contracts for bridges, but knew that Kaiser had. (Wade Dep. Tr. at 149-50.) Likewise, he also

testified that he had no direct experience in maintenance dredging. (*Id.* at 113.) Wade conceded

that he was not an authorized COR and that, if Kaiser was, "he gets me on that." (*Id.* at 151.)

Finally, regarding Kaiser's temporary position as Acting Chief of the O&M Section, Wade stated

the experience "would certainly be relevant" to the Army's decision. (*Id.* at 152.)

The record demonstrates that the Army placed a considerable emphasis on the O&M

Section Chief having experience with fieldwork and construction contract administration

pertaining to dredging, bridges, and dams. The Panel's notes from Kaiser's interview show that

Kaiser answered that he had such experience, and his resume supports that conclusion as well.

Moreover, Kaiser held the very position at issue in this case in a temporary capacity for three

months, confirming the Army's justification that he was more qualified than Wade. *See Moore*

*v. Mukasey*, 305 F. App'x 111, 117 (4th Cir. 2008) (concluding that selectee's temporary

position supported defendant's assertion that selectee was more qualified than plaintiff). The

Panel's notes from Wade's interview, on the other hand, show that he answered that he had no

direct dredging experience or direct experience with bridges. His deposition testimony further

confirms his lack of experience in those areas as well. Accordingly, Wade has failed to

demonstrate that the Army's legitimate, nondiscriminatory reasons were a pretext for age

discrimination.

14

b.      Kaiser's Alleged Pre-Selection

Wade next argues that the Army's legitimate reasons for not selecting him are a pretext

for age discrimination because the Army pre-selected Kaiser for the O&M Section Chief position

prior to conducting any interviews. (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ. J. 23-24.)  In

support, Wade states that after he applied for O&M Section Chief, but before he interviewed, he

heard during "watercooler conversation" that the Army planned to hire Kaiser for the position.

(Wade Dep. Tr. at 117.)  Further, after being notified of his non-selection via email, Wade

testified that Kelly came and notified Wade in-person that he had not been selected.  (*Id.* at 124-

25.)  During the conversation, Wade told Kelly that he was not surprised at his non-selection, as

he believed the Panel knew whom they were going to hire from the very beginning.  (*Id.* at 125.)

Kelly did not deny Wade's assertion.  (*Id.*)  Lastly, Wade had a meeting with Tunnel on May 11,

2016 to discuss his non-selection.  (*Id.* at 126.)  During that meeting, Tunnel initially informed

Wade that the Army preferred someone with more dredging experience for the O&M Section

Chief position.  (*Id.* at 128.)  Tunnel then said that he and Jose Alvarez "kind of knew that

[another individual] was who they were going to select."  (*Id.* at 129.)

Wade's argument that the Army's pre-selection of Kaiser demonstrates pretext also fails.[4]

At its core, whether the Army pre-selected Kaiser in no way undermines or would allow the fact-

finder to disbelieve the Army's assertion that Kaiser was more qualified than Wade to be O&M

Section Chief.  Indeed, numerous courts have found that pre-selection, on its own, does not

demonstrate pretext. *See Hiner v. McHugh*, 546 F. App'x 401, 407 (5th Cir. 2013) (stating that

pre-selection, in and of itself, does not establish pretext unless the pretext was motivated by

discriminatory animus) (citing *Walsdorf v. Bd. of Comm'rs for the E. Jefferson Levee Dist.*, 857

---

[4] In its Reply Brief, the Army asserts Wade has not demonstrated that the Army pre-selected Kaiser.  (Def.'s Reply Br. 2-3.)  However, we will construe this fact in favor of Wade, as we must when deciding a motion under Rule 56. *See Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998).

F.2d 1047, 1051 (5th Cir. 1988); *Glass v. Lahood*, 786 F. Supp. 2d 189, 224 (D.D.C. 2011));

*Moore*, 305 F. App'x at 117 (finding that plaintiff's argument regarding pre-selection did not

establish that defendant's stated reasons were pretext); *Anderson v. Westinghouse Savannah*

*River Co.*, 406 F.3d 248, 271 (4th Cir. 2005) (stating that supervisor's pre-selection of an

employee for promotion "is not sufficient evidence for jurors reasonably to conclude" that the

explanation surrounding employee's selection was pretextual); *Kennedy v. Landon*, 598 F.2d

337, 341 (4th Cir. 1979) (finding pre-selection did not violate discrimination prohibited by Title

VII, even though such conduct may have violated the rules and regulations of the Department of

Corrections); *Glass*, 786 F. Supp. 2d at 224 (stating "there is nothing *per se* improper about

'preselection[,]' unless there is "indicia of discrimination attached to the preselection") (citing

*Pearsall v. Holder*, 610 F. Supp. 2d 87, 100 n.12 (D.D.C. 2009); *Nyunt v. Tomlinson*, 543 F.

Supp. 2d 25, 39 (D.D.C. 2008), *aff'd*, 589 F.3d 445 (D.C. Cir. 2009)).

During his deposition, Wade recounted his conversations with Kelly and Tunnel

following his non-selection.  Significantly, at no time did either Kelly or Tunnel mention Wade's

age or that age was a consideration in selecting Kaiser over Wade.  Even assuming Kaiser was

pre-selected for the O&M Section Chief position, pre-selection cannot establish pretext unless

there is indicia of discriminatory animus.  Accordingly, Wade has failed to demonstrate that the

Army's pre-selection of Kaiser shows pretext for unlawful age discrimination.

c.          Subjective Criteria in Evaluating the Candidates

Lastly, Wade argues that he sufficiently establishes pretext because the Army's

evaluation of the candidates was entirely subjective.  (Pl.'s Mem. Law Opp'n Def.'s Mot. Summ.

J. 24-26.)  On the issue of pretext, the United States Court of Appeals for the Third Circuit has

held that "subjective evaluations are more susceptible of abuse and more likely to mask pretext."

*Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 320 (3d Cir. 2000) (alteration omitted) (quoting *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)).

Wade cites *Alvarado v. Tex. Rangers*, 492 F.3d 605 (5th Cir. 2007) and *Julian v. City of Houston*, No. 12-2973, 2014 WL 3795580 (S.D. Tex. July 31, 2014), in support of his argument that the Army's subjective criteria in evaluating the candidates establishes pretext. Both cases are distinguishable. In *Alvarado*, the plaintiff was one of 146 applicants for ten available Sergeant positions in the Texas Department of Public Safety Rangers Division. *Alvarado*, 492 F.3d at 609. The selection process consisted of a written examination that covered the technical job knowledge and related skills, and an interview before a six-member board. *Id.* The plaintiff ranked twenty-fifth in the written examination and twenty-ninth in her oral examination. *Id.* at 610. After her appearance in front of the board, the plaintiff ranked twenty-ninth overall. *Id.* The top ten candidates, all of whom were male, were offered positions, and the plaintiff subsequently filed suit on the basis of gender discrimination. *Id.* The District Court granted summary judgment in favor of the employer, finding "no indication that there [was] anything inherently discriminatory in the process nor that [plaintiff] [was] discriminated against." *Id.*

The Fifth Circuit reversed. Regarding pretext, the court first noted that "[a]n employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection." *Id.* at 616 (citing *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004)). The court explained that a subjective reason will satisfy the employer's burden "only if the employer articulates a clear and reasonably specific basis for its subjective assessment." *Id.* (citations omitted). However, the employer's reliance on subjective factors in *Alvarado* was not sufficient for purposes of summary judgment because it failed to offer any evidence or

explanation as to the plaintiff's interview scores. *Id.* The plaintiff's interview score sheet did not contain any notes or comments about her interview performance, and the employer failed to present any deposition testimony that would show why the board scored the plaintiff and other candidates the way they did. *Id.* On those facts, the Fifth Circuit held that the employer did not satisfy its burden of presenting a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 617.

In *Julian*, the plaintiff sued the defendant for discrimination based on his non-selection for the position of Fire Chief. *Julian*, 2014 WL 3795580, at *6. Twenty-four individuals applied for the position. *Id.* at *2. Utilizing a ranking system that consisted of twelve criteria, the applications and the candidates' written answers to submitted questions were evaluated to narrow the field to twelve. *Id.* The plaintiff was not among those selected to continue in the process, and he then brought suit under age, race, and retaliation claims of discrimination. *Id.* at *6.

The District Court found that the employer's reliance on the ranking system was insufficient for the employer to be granted summary judgment. *Id.* at *9-11. In its analysis, the court noted that "relatively detailed and specific notes as to how the evaluators reached their conclusions with regard to each of the criteria and each of the applicants would best serve to dispel any concern that impermissible discriminatory motives could have entered the evaluation process." *Id.* at *10. However, the employer offered no notes or documents concerning how it reached its conclusions as to the criteria. *Id.* Likewise, the employer failed to offer any witnesses who were able to explain their scores. *Id.* Relying on *Alvarado*, the court in *Julian* similarly concluded that the employer's subjective evaluations were insufficient at the summary judgment stage. *Id.* at *11.

Wade's reliance on *Alvarado* and *Julian* is misplaced, as both cases are clearly distinguishable from the case at bar. In concluding that the employers' reliance on subjective factors was insufficient for purposes of their legitimate, nondiscriminatory reasons, the *Alvarado* and *Julian* courts found it significant that there was no clear and reasonable basis for the subjective assessment of the candidates. *See Alvarado*, 492 F.3d at 616-17; *Julian*, 2014 WL 3795580, at *10. This is in stark contrast to the instant case, where the Army has relied on objective qualifications that pertain to the candidates' experience with dredging, dam, and bridge work. Moreover, unlike the employers in *Alvarado* and *Julian*, the Panel members took extensive notes during each candidate's interview that fully supports their reasoning that Kaiser had more relevant experience than Wade. Therefore, even though the Panel members ranked each applicant at the conclusion of the interviews, as the employers did in *Alvarado* and *Julian*, the rankings were supported by proper documentation and deposition testimony.

## IV.    CONCLUSION

The O&M Section Chief job announcement, the Selection Plan, the first interview question, and the various deposition testimony all demonstrate that the Army placed a considerable emphasis on the next O&M Section Chief having experience in dredging, dam, and bridge work. Wade has failed to demonstrate that the Army's legitimate, nondiscriminatory reason for not promoting him—that Kaiser was more qualified for the job—was a pretext for unlawful age discrimination. For the reasons noted above, the Army's Motion for Summary Judgment is granted.

An appropriate Order follows.